UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF WEST VIRGINIA
AT CHARLESTON

FRANKLIN BRAGG,

      Plaintiff

v.                           CIVIL ACTION NO. 2:05-0355

JOYCE VESSEY SWANSON
in her official capacity as
principal of Hurricane High School and
THE BOARD OF EDUCATION
OF THE COUNTY OF PUTNAM,

      Defendants

### MEMORANDUM OPINION AND ORDER

Pending is plaintiff's motion for a preliminary injunction and temporary restraining order, filed May 3, 2005. Pursuant to Rule 65(a)(2), the court ordered the trial of this action advanced and consolidated with the hearing on plaintiff's motion. The parties consented to this action both prior to, and during, the bench trial conducted on May 9, 2005.

### I.  Introduction

This action involves a high school student who was disciplined for wearing a T-shirt that displayed the Confederate flag. He wore the shirt in observance of his southern heritage. For some, the mere mention of the emblem evokes strong feelings.

The focus of this opinion, however, is not alone on the Confederate flag.  Rather, as observed by then-Chief Judge Wilkinson in another flag-inspired case, a much broader principle is at stake:

> When a legislative majority singles out a minority viewpoint in such pointed fashion, free speech values cannot help but be implicated. And it is as a free speech case, not as a Confederate flag case, that this appeal must be resolved.
>
> It is important to keep the issue here in some perspective. The vast majority of Virginians have no desire to display a Confederate logo on their license plates. The vast majority of Virginians seek venues other than a motor vehicle tag for the observance of their lineage, and do not view the Confederate flag as symbolically celebrating their line of descent. The vast majority of Virginians understand that one motorist's proclamation of heritage is another's reminder of the unspeakable cruelties of human bondage. The vast majority of Virginians recognize the sad paradox of Confederate history--namely, that individual southerners, so many good and decent in themselves, swore allegiance to a cause that thankfully was lost, and to practices that no society should have sought to defend.
>
> But the First Amendment was not written for the vast majority of Virginians. It belongs to a single minority of one. It is easy enough for us as judges to uphold expression with which we personally agree, or speech we know will meet with general approbation. Yet pleasing speech is not the kind that needs protection.

Sons of Confederate Veterans, Inc. v. Commissioner of Virginia Dept. of Motor Vehicles, 305 F.3d 241, 242 (4th Cir. 2002) (Wilkinson, C.J., concurring in denial of rehearing en banc). With this in mind, the court proceeds to the analysis.

II.  Findings of Fact

A.   Prior Racial Incidents in Putnam County Schools

Hurricane High School ("school") is located in Putnam County.  It has a student population of 1004, 14 of whom are African-American.  Plaintiff Franklin Bragg is an eighteen (18) year-old senior at the school.  While enrolled there, he has enjoyed a relatively unblemished disciplinary record.

Defendant Joyce Vessey Swanson was named the new principal ("principal") at the school for the 2004-2005 school year.  She is employed in that capacity by the defendant Board of Education of the County of Putnam ("board").  The principal, who once served as a teacher at the school from 1975 to 1988, formerly served as assistant principal at Poca High School in the same county from 1988 to 1997.  Later, she served as principal of Buffalo High School from 2000 to 2004, another secondary educational institution in the county.  During her tenures at these schools, the principal had several negative experiences with the Confederate flag ("flag"):

   1.   Poca High School.  In 1989, one of the first, if not the first, African-American student at the school joined the cheerleading squad.  At the initial pep

3

rally, some fellow students greeted her from the stands by wearing flag attire and unfurling large flags between them.  This caused the cheerleader to leave the floor.  The principal confiscated the items.

2.   Poca High School.  In 1994, two students wearing flag attire referred to a male African-American student as a "nigger" and used other racial epithets when he exited the school bus.

3.   Buffalo High School.  In 2002, an incoming freshman was greeted outside the school by a group of students displaying the flag.  The students were also wearing the flag on their clothing, exhibiting it on their vehicles, and generally creating a gauntlet-like environment calculated to intimidate the student.  Some other students came to the young man's defense.  The situation was subsequently defused by a combination of both disciplinary action and the movement of staff within the school.  The principal stated the incident was very disruptive to the learning environment.

After arriving at the school, and implementing the dress code changes discussed _infra_, an incident occurred in September 2004.  A new ninth grade African-American student left his spiral notebook in a classroom.  When the student returned to retrieve it, he found someone had defaced it with a variety of racist language and symbols.[1]  (Defs.' ex. 1.)  The student was

---

[1]Etched on the cardboard cover was written "Roger is a nigger" and "nigger lover."  Near the bottom of one inside page was a small sketch of the flag just above which was written "rebel" and just below which was written "nigger hater."  On another page was written "Shut up nigger" and "nigger's" with one undecipherable, struck-through word located below it, along with another unclear word appearing further below an intervening drawing of an eight-pointed star.  The words and images are
                                                         (continued...)

4

understandably distraught and missed a day of school.
Unfortunately, the perpetrator(s) was never identified.

Despite this incident, Lisa Adkins indicated that there
is a good racial environment at the school.  This is significant
because Ms. Adkins regards herself as an African-American,
although her lineage is 1/3 each African-American, Caucasian, and
Native American.  She observed that people of both races mix
freely at the school and are friendly with one another.  She has
not seen any disputes of a racial character involving flag
paraphernalia during her time at the school.  While recognizing
that her testimony may possibly be influenced by a desire to
maintain cordial relations with her fellow students at the
school, which appears to be heavily Caucasian, the court credits
her testimony which stands unimpeached.

B.    The Dress Code

The board has promulgated a Policy Manual setting forth
the rules and regulations applicable to the schools under its
jurisdiction.  The applicable provisions follow:

---

[1](...continued)
difficult to decipher in view of the fact that defendants were
only able to tender a xerox copy of the notebook.

5

Attire and appearance.  Students in Putnam County have
the right to equal educational opportunities.  In order
to create a learning environment and to foster good
citizenship within the school, the following attire and
appearance rights and responsibilities are established
during the regular school day with the intention of
providing students with the greatest freedom in
deciding what they can wear to school and at the same
time protecting everyone's right to equal educational
opportunities.

These regulations are minimum standards for attire and
appearance.  Schools may require additional standards
as may be appropriate.

. . . .

Students have the right to wear any clothing or
accessories imprinted with slogans or advertisements as
long as they do not contain obscenity, profanity, or
advertisements of illegal drugs. . . .

. . . .

Inappropriate Dress or Grooming - A student will not
dress or groom in a manner that disrupts the
educational process or is detrimental to the health,
safety, or welfare of others. A student will not dress
in a manner that is indecent or distractive, to the
extent that it interferes with the teaching and
learning process, including wearing any apparel that
displays or promotes any drug, alcohol, or tobacco
related product that is prohibited in school buildings,
on school grounds, in school-leased or owned vehicles,
and at all school sponsored functions.

Board of Education of the County of Putnam, Policy Manual §

S.5.2, S.5.17.4(6) (Jul. 25, 1995 and supp. June 7, 2004).

     The board policy makes no mention of the flag.  Indeed,

neither the words "confederate" nor "rebel" appear anywhere in

the 270 page document.  The principal's prior experiences with the flag at other schools, however, along with a request from the school's faculty senate to ban its display, influenced her to expand the school's dress code in that regard.  To that end, the school instituted a "DRESS CODE ENFORCEMENT[,]" policy ("policy") at the beginning of the 2004-2005 school year which, as devised by the principal, provides pertinently as follows:

| WHAT County Policy SAYS | HOW IT WILL BE INFORCED [SIC] |
|---|---|
| . . . . | . . . . |
| 6.  Offensive language or symbols are not permitted. | Profanity, vulgarity, sexual innuendo, and <u>racist language and/or symbols or graphics are prohibited.  This includes items displaying the Rebel flag</u>, which has been used as a symbol of racism at high schools in Putnam County. |

(Ex. 2 at 2 (emphasis added).)[2]  Students are permitted to wear items bearing the flag's image to after-school, extra-curricular activities.

The principal stated that if the ban is ever lifted at the school it will result in a significant exhibition of the flag

---

[2]While the text on the left hand side following the number 6 above may have been the product of an effort to reasonably interpret the board policy, the court notes the language nowhere appears therein.

that will be disruptive of the school environment.  She conceded

that prior to her arrival at the school the flag was a

permissible mode of expression and no complaints or incidents

ever attended its display.[3]  The principal also acknowledged that

the flag can be found at the school in text book illustrations

and on materials located within the school library.

The school permits students to wear clothing bearing

other content-specific expressions.  Most significantly, some

students have worn, and continue to wear, Malcolm X T-shirts,

which one court has identified as being tied to what it terms the

---

[3]Without reference to any dates or identities, the principal
testified to two incidents during the current school year where
students who had previously worn flag clothing to the school used
racist language on an occasion when flag attire was not being
worn.  In view of the apparent lack of the flag being employed
during the incidents, the court does not assign any significant
weight to the observation.  The court also sustained a hearsay
objection, and thereby implicitly struck, the principal's
testimony regarding another lesser incident.
The court notes that William Michael Ellis, a teacher,
testified on cross-examination simply that the flag had caused
disruption at the school prior to the principal's arrival and
implementation of the new policy but did not relate the nature of
the disruption.  He noted no disciplinary action was ever
undertaken though, suggesting the "disruption" may have been of a
more benign genre.  The testimony lacked both specificity and a
temporal anchor.  Mr. Ellis harbors decided feelings concerning
the flag.  He noted that, prior to the policy, he commented on
flag clothing from time to time and "told [students] his own
personal viewpoint on it."  The court also notes the principal's
observation that she was never informed of any flag-related
incidents at the school prior to implementation of the policy.

"Black Muslim movement." Castorina ex rel. Rewt v. Madison County School Bd., 246 F.3d 536, 541 (6th Cir. 2001). The Malcolm X T-shirts have been worn by white students before, and a few times since, plaintiff was disciplined in November.[4]

Students wearing clothing with prohibited messages relating to alcohol have not been disciplined at times. Plaintiff stated he sees two or three of these shirts each day, with references to Jim Beam, Jack Daniels, and tequila, without consequences enuring to the offenders.

C.  Plaintiff's Clothing

Plaintiff has a wardrobe filled with clothing and accessories upon which the flag appears. In addition to his belt buckle, every shirt but two that plaintiff owned bore a flag symbol. During his three years at the school, plaintiff wore a T-shirt with some depiction of the flag on it nearly every day. On a monthly average, plaintiff wore flag-bearing clothing every school day but one.[5]

---

[4]The principal stated it would be permissible for students to wear a variety of politically inspired clothing, including everything from shirts advocating John Kerry to shirts proclaiming President George W. Bush as "an idiot."

[5]On this single day out of the month, plaintiff wore other
(continued...)

9

Plaintiff described his array of flag T-shirts in great detail. The first shirt displayed the flag and the American flag, along with another blazon that he could not recall. The second bore the image of a "little Chow dog" in a doghouse wearing a rebel flag bandana on its head. The third exhibited a Ford truck with the flag in the background. The fourth displayed two puppies near a football superimposed over an image of the flag. Another shirt exhibited the flag along with an image of an alcohol product. Plaintiff, however, deemed this shirt "inappropriate" for school, and he did not wear it there.

The particular shirt ("shirt") that precipitated the initial disciplinary action resulting in the filing of this lawsuit was offered as plaintiff's exhibit four at trial. It bore a small 2 inch by 4 inch graphic on the front that had the words "Dixie Outfitters" superimposed over the flag. (Pl.'s ex. 4.) On the reverse side is a 10.5 inch by 11 inch image of a bloodhound whose paws are hanging over the busted out portion of a wooden fence with an image of part of the flag in the background, and the words "Dixie Outfitters" at the top and

---

[5](...continued)
types of shirts, including one containing the fireman's prayer. The shirt, and others like it, were worn in observance of plaintiff's service to the Hurricane Volunteer Fire Department.

10

"Southern Comfort" and "Blood Hound" at the bottom.  (Id.)  There is also a score tally visible, with the "Rebels" leading the "Yanks."  (Id.) The principal does not assert the shirt in any way offends the school's policy aside from its inclusion of the flag.  There is no suggestion in the record that any part of the shirt other than the flag itself is seen as an offensive symbol.

The belt buckle in issue bore a 1 inch by 1.75 inch image of the flag, along with a listing of the original Confederate states.  (Pl.'s ex. 5.)  Plaintiff wore it every day for over three years while at the school.  He wore during the school day one of the foregoing shirts on the average of once each day per school week.

D.   Plaintiff's Heritage and the Reaction to His Clothing

Plaintiff has a strong sense of his southern heritage. He wore the flag shirts and belt buckle in observance of his roots.  Plaintiff's father hails from Texas and other family members claim southern heritage as well.  Plaintiff also had relatives who fought on the side of the Confederacy during the Civil War.  One of plaintiff's existing relatives participates in Civil War reenactments.

11

There is no basis in the record for concluding that plaintiff, who has African-American friends, is a racist.[6]  One such friend, Lisa Adkins, testified at trial as earlier noted. Adkins, a senior at the school, stated that plaintiff's clothing does not bother her and that other African-American friends are not offended by the shirt.  She also testified that no racial animus has ever been directed toward her by individuals wearing flag clothing.

Over the course of the three-plus years plaintiff wore clothing and accessories exhibiting the flag, neither he nor the school received a single complaint or comment concerning them. Additionally, as testified by Lisa Adkins, seventy-five (75) to eighty (80) percent of the students wore flag apparel at the school prior to the ban.

---

[6]On cross examination, plaintiff acknowledged that he once used the "'N' word" while playing in a football game.  He explained he did so after African-American students on the opposing team used a variety of derogatory terms toward him and fellow teammates during the game, including "crackers."  He seemed genuinely contrite about the incident, stated the offensive term "slipped out[,]" and he accepted his ejection from that game and the game suspension he received as punishment. Importantly, he added that the use of that deplorable word is not a part of his heritage.  Although plaintiff offered an explanation as to why he used the term, he conceded, as he must, his guilt in uttering an unforgivable racial slur.  The court has credited his testimony in its entirety.

12

E.    The November and February Incidents

In November 2004, plaintiff wore the shirt to school,
along with the belt buckle.  The principal confronted plaintiff
about the shirt and explained that items displaying the flag were
banned from the school.  Plaintiff was required to remove the
shirt or wear it inside out.  No mention was made of the belt
buckle.  The school record states that plaintiff was directed to
serve one day in noon detention hall for violating the ban, but
plaintiff says it was four periods of detention.  The punishment
left him only five minutes on each such day to eat his lunch and
nearly caused him to miss the deadline for ordering certain
graduation materials.  Plaintiff obediently refrained from
wearing the shirt, or any of his other flag shirts, for the
remainder of the school year to this point.

Four months later, in February 2005, plaintiff was
confronted by teacher Ruben Ellis.  Mr. Ellis asked plaintiff to
hide the flag image on his belt buckle and plaintiff ultimately
complied.  The two visited the office of Sara Welch, the school's
assistant principal, who formerly served at Buffalo High School
with the new principal.  Ms. Welch told plaintiff to remove the

13

belt buckle.   She concedes she never received any complaints
about the buckle from fellow students.   Plaintiff was
additionally warned that consequences would follow if he wore the
item again.   Ms. Welch explained that plaintiff spoke with her at
length and sincerely represented to her that he wore the flag as
a statement of his heritage and not because of any racial animus.
She responded that the flag was part of her heritage too, in that
an ancestor owned slaves, and that she was not proud of the
symbol.   In the end, plaintiff complied and bought a new belt
buckle.


F.   The Litigation and Request for Relief


          On April 28, 2005, plaintiff instituted this action
with a verified complaint.   His one-count pleading alleges that
defendants' actions violated his rights under the First
Amendment.[7]   He seeks:

> [1] permanent injunctive relief; [2] a declaration that
> . . . [defendants'] actions . . . were and are

---

[7]In paragraph 3 of his complaint, plaintiff alleges "this
court has pendent jurisdiction of Plaintiff's state
constitutional claims to freedom of speech guaranteed by article
III §§ 1, 23, 7,10, 11, 15 16 and 20 of the West Virginia State
Constitution." (Compl. ¶ 3.)   Plaintiff disclaimed any reliance
upon state law at trial.   Accordingly, the court reaches only the
First Amendment claim.

14

unconstitutional, illegal, and void, and . . . in
contravention of Plaintiff's constitutional rights; . .
. [3] expungement . . . of any reference to the
disciplinary action relating to his . . . [flag
clothing]. . . [;] [4] . . . reimburse[ment] . . . for
his reasonable attorneys' fees, expenses, and costs . .
. and all such further relief as the Court may deem
just and proper.

(Compl. prayer for rel.)


III.   Conclusions of Law


A.   The Applicable Standard


The First Amendment provides "Congress shall make no

law . . . abridging the freedom of speech . . . ."  U.S. Const.

amend. I.  In Tinker v. Des Moines Independent Community School

Dist., 393 U.S. 503, 504 (1969), the Supreme Court observed the

"wearing of an armband [in school] for the purpose of expressing

certain views . . . . was closely akin to 'pure speech' . . .

entitled to comprehensive [First Amendment] protection[.]"  Id.

at 505-06.  The Court has also held, however, "the constitutional

rights of students in public school are not automatically

coextensive with the rights of adults in other settings."  Bethel

School Dist. No. 403 v. Fraser, 478 U.S. 675, 682 (1986).


15

In determining the applicable standard by which to judge the school's policy, a trilogy of Supreme Court cases are relevant.  The starting point is <u>Tinker</u>.  Our court of appeals has distilled <u>Tinker</u>'s analysis:

> Responding to the school authorities' attempt to justify their actions by reason of a concern about the possibility of the armbands' creating a disturbance in school, the Court held that, "in our system, undifferentiated fear or apprehension of disturbance is not enough to overcome the right to freedom of expression." <u>Id.</u> By contrast, "conduct by the student, in class or out of it, which for any reason--whether it stems from time, place, or type of behavior--<u>materially disrupts class work or involves substantial disorder or invasion of the rights of others is, of course, not immunized by the constitutional guarantee of freedom of speech.</u>" <u>Id.</u> at 513, 89 S.Ct. 733. Accordingly, <u>Tinker</u> "requires a <u>specific and significant fear of disruption, not just some remote apprehension of disturbance.</u>" <u>Saxe v. State Coll. Area Sch. Dist.</u>, 240 F.3d 200, 211 (3d Cir.2001). In sum, "if a school can point to a well-founded expectation of disruption-especially one based on past incidents <u>arising out of similar speech</u>--the restriction may pass constitutional muster." <u>Id.</u> at 212.

<u>Newsom ex rel. Newsom v. Albemarle County School Bd.</u>, 354 F.3d 249, 256 (4th Cir. 2003) (emphasis added).

The second case is <u>Fraser</u>, where a student employed a generous amount of sexual metaphor to nominate a classmate for office.  The offending student instituted suit after he was punished.  In upholding the school's intervention, the Supreme Court noted "society's ... interest in teaching students the

16

boundaries of socially appropriate behavior." Fraser, 478 U.S.
at 681.  The opinion authorizes school administrators to promote
the "fundamental values of 'habits and manners of civility,'" by
"insisting that certain modes of expression are inappropriate and
subject to sanctions." Id. at 681, 683.  Fraser is thus properly
understood as an exception to Tinker's disruption requirement.
That requirement, under Fraser, is avoided when the banned speech
is "lewd, vulgar, indecent, or plainly offensive." Newsom, 354
F.3d at 256.

The third case is Hazelwood School Dist. v. Kuhlmeier,
484 U.S. 260 (1988).  In Hazelwood, school officials censored two
articles that were to appear in the school newspaper.  One
article dealt with the pregnancies of certain enrolled students
and the other discussed how divorce impacted young adults.  Both
stories were censored based upon the principal's fears that,
respectively, (1) the identities of the pregnant students were
insufficiently masked, and (2) the divorced parents were not
given sufficient time to respond to the piece.

The newspaper staff instituted suit, but the Supreme
Court aligned itself with the school for a variety of reasons,
including the following considerations: (1) the paper was not a
public forum, (2) publication was a school-sponsored activity in

17

an advanced journalism class, thus leading readers to infer school approval of the newspaper's content, and (3) the important privacy interests enjoyed by both the pregnant students and the families in the midst of divorce.  Ultimately, the Supreme Court held "that educators do not offend the First Amendment by exercising editorial control over the style and content of student speech in school-sponsored expressive activities so long as their actions are reasonably related to legitimate pedagogical concerns."  Id. at 272-73 (footnotes omitted).

Regarding Fraser, and despite defendants' arguments to the contrary, the display of the flag is not per se and patently offensive.  In an analogous case, the United States Court of Appeals for the Eleventh Circuit observed two distinct ways in which the flag is viewed:

> The plaintiffs' experts plan to testify that "the Confederate battle flag is not a symbol of racism, but rather a historical symbol embodying the philosophical and political principals [sic] of a decentralized form of government in which states and local government retain all powers not expressly ceded to the centralized federal government under the constitution" and that thus the flag is merely "a symbol of southern heritage."  The defendant's expert plans to testify that "from its inception, the confederacy was a political movement dedicated to the preservation of the institution of slavery. Therefore from its inception, the confederacy and its symbols represented approval of white supremacy" and that "the confederate flag is a symbol that has acquired numerous racist associations to the point that the flag itself has understandably

18

come to be perceived as a racist symbol."

> The problem, of course, is that both of them are correct.

Scott v. School Bd. of Alachua County, 324 F.3d 1246, 1248-49 (11th Cir. 2003); Sons of Confederate Veterans, Inc. ex rel. Griffin v. Commission of Virginia Dept. of Motor Vehicles, 288 F.3d 610, 624 (4th Cir. 2002) (noting competing views and interpretations regarding the flag).[8]  The same observation holds in the context of this case.  Although some seventy-five (75)

---

[8]Our court of appeals has discussed Confederacy-related symbols on several occasions.  For instance, in Crosby by Crosby v. Holsinger, 816 F.2d 162 (4th Cir. 1987), students instituted a First Amendment challenge to a principal's ban on the school's longstanding "school mascot and logo[,] the figure of 'Johnny Reb,' a caricature of the emblematic Confederate soldier."  Id. at 163.  The district court dismissed the complaint as frivolous. After noting "there was no indication of disruption or violence in the school's history that had been occasioned by the use of 'Johnny Reb[,]'" the court of appeals reversed.  Id. at 163.  In doing so, Judge Ervin observed for the panel that "The Supreme Court has not been receptive to schools that prohibit students from wearing items of clothing with political significance."  Id. at 164.

After a second appeal following development of the merits, the court of appeals turned away the students' challenge under Hazelwood:

> Under the recent Supreme Court decisions noted above, school officials have the authority to disassociate the school from controversial speech even if it may limit student expression. Principal Holsinger was within his power to remove a school symbol that blacks found offensive.

Crosby by Crosby v. Holsinger, 852 F.2d 801, 803 (4th Cir. 1988).

19

percent of the students at times prior to the policy wore flag paraphernalia at the school, their actions generated no complaints or incidents of a racial nature. Accordingly, <u>Fraser</u> is of little utility here.

The same analysis holds true with <u>Hazelwood</u>. No reasonable person would attribute school sponsorship to any individual student's decision to wear flag clothing. Accordingly, the <u>Tinker</u> standard governs the analysis. <u>See</u> <u>Newsom</u>, 354 F.3d at 257; <u>Castorina ex rel. Rewt v. Madison County</u> <u>School Board</u>, 246 F.3d 536, 541 (6th Cir. 2001).

B.    Prior Precedent Involving <u>Tinker</u> and Flag Restrictions

There are a handful of circuit court decisions addressing school flag bans. The factual settings in these cases, along with the relief awarded, inform application of the <u>Tinker</u> analysis.

The first case is <u>Scott</u>. In <u>Scott</u>, a three-page, <u>per</u> <u>curiam</u> opinion, a principal instituted an unwritten ban on display of the flag. When two students violated the ban, they were disciplined and subsequently filed suit. In upholding the ban, the court observed "School officials presented evidence of

20

racial tensions existing at the school and provided testimony regarding fights which appeared to be racially based in the months leading up to the actions underlying this case." Id. at 1249.

Second, in Sypniewski v. Warren Hills Regional Board of Education, 307 F.3d 243 (3rd Cir. 2002), the court was faced with the constitutionality of "a public school's racial harassment policy against a background of demonstrated racial hostility." Id. at 246. The policy "was enacted [in 2001] in response to a pattern of disturbing racial incidents [from 1999 to 2001]." The incidents are profound in scope. Among others, the school experienced the following egregious events:

1. A student appeared for a school Halloween party in black face with a noose around his neck;

2. A student complained about fellow students wearing tee shirts emblazoned with an image of the confederate flag, some of whom formed a gang-like group known as the Hicks, and observed "White Power Wednesdays" by wearing the shirts;

3. A student walked down the hall of the school waving a large Confederate flag;

4. In response to a student's association with several African-Americans, a large group of teenagers drove to his house where they physically threatened him and called him a "nigger lover," among other expletives;

5. Numerous displays of racist graffiti were found on school walls, some of which inspired hostile graffiti responses;

21

> 6.   Students played a dehumanizing, racist song from their trucks in the parking lot; and
>
> 7.   Near the end of the school year, a fight occurred between a black student and a white student that resulted in one student sustaining a concussion and requiring stitches.

Quite understandably, the court observed the school was "afflicted with pervasive racial disturbances throughout the 2000-2001 school year." Id. at 248. Accordingly, in dicta, the court suggested a flag ban would have been appropriate under Tinker. Id. at 254.

Third, the court notes West v. Derby Unified School Dist. No. 260, 206 F.3d 1358 (10th Cir. 2000). In West, the school district adopted a racial harassment policy in response to severe racial tension at the school. By example, the policy barred "clothing, articles, material, publications or any item that denotes Ku Klux Klan, Aryan Nation-White Supremacy, Black Power, Confederate flags or articles, Neo-Nazi or any other 'hate' group." Id. at 1361. The suspended student who was the subject of West drew the flag on a piece of paper during math class. The court detailed the tense racial environment at the school:

> [I]n early 1995, several verbal confrontations occurred between black and white students at Derby High School. Some white students wore shirts bearing the image of

22

the Confederate flag, while some black students wore
shirts with an "X", denoting support for the teachings
of Malcolm X. Members of the Aryan Nation and Ku Klux
Klan became active off campus circulating materials to
students encouraging racism. Around the same time,
graffiti stating such things as "KKK" (Ku Klux Klan),
"KKKK" (Ku Klux Klan Killer), and "Die Nigger" appeared
on campus in bathrooms and on walls and sidewalks.
School officials received reports of racial incidents
on school buses and at football games. At least one
fight broke out as a result of a student wearing a
Confederate flag headband.

Id. at 1362.  The ban enacted in 1995 was found to be

constitutional, but at least one court has interpreted West very

narrowly.  Castorina, 246 F.3d at 543-44 ("As a result, the Tenth

Circuit's decision in West merely demonstrates that a school

board may ban racially divisive symbols when there has been

actual racially motivated violence and when the policy is

enforced without viewpoint discrimination.") (emphasis added).[9]

        Fourth, in Castorina a high school principal suspended

two students for wearing flag-bearing T-shirts.  He concluded the

T-shirts violated the school dress code, which banned clothing

_____

        [9]There are several other cases dating back thirty years that
address flag bans or use of the flag in schools.  See, e.g.,
Augustus v. School Bd. of Escambia County, 507 F.2d 152 (5th Cir.
1975); Melton v. Young, 465 F.2d 1332 (6th Cir. 1972); Banks v.
Muncie Community Schools, 433 F.2d 292 (7th Cir. 1970).  In view
of the undeniably tense racial environment in those cases, along
with their temporal proximity to the school desegregation era,
the court has confined its review to cases from our courts of
appeal of a more recent vintage.

containing any "illegal, immoral or racist implications." Id. at
538.  Illustrating the importance of a school's history with the
banned symbol or item, the Sixth Circuit court remanded the case,
in part, because the record was unclear as to "whether Madison
County High School had actually experienced any racially based
violence prior to the suspensions." Id.

C.    Prior Precedent Guiding the Overbreadth Analysis

        The overbreadth doctrine is a unique area of
constitutional jurisprudence because it is "a departure from
traditional rules of standing." Broadrick v. Oklahoma, 413 U.S.
601, 613 (1973).  In the First Amendment context, the doctrine
often allows "an individual . . . [to] 'challenge a statute on
its face because it also threatens others not before the court --
those who desire to engage in legally protected expression but
who may refrain from doing so rather than risk prosecution or
undertake to have the law declared partially invalid.'" Newsom
v. Albemarle County School Board, 354 F.3d 249, 257 (4th Cir.
2003) (quoting Board of Airport Commissioners v. Jews for Jesus,
Inc., 482 U.S. 569, 574 (1987)).

24

At the same time, "the overbreadth doctrine is not casually employed" because of its "wide-reaching effects . . . ." Los Angeles Policy Dep't v. United Reporting Publ'g Corp., 528 U.S. 32, 39 (1999) (citations and internal quotation marks omitted).  Courts have deemed it "strong medicine and have employed it with hesitation, and then only as a last resort." Id.  Specifically, "a law should not be invalidated for overbreadth unless it reaches a substantial number of impermissible applications."  New York v. Ferber, 458 U.S. 747, 771 (1982).  To prevail, one making an overbreadth challenge "must demonstrate that a regulation's overbreadth is 'not only . . . real, but substantial as well, judged in relation to the [challenged regulation's] plainly legitimate sweep . . . ." Newsom, 354 F.3d at 258 (quoted authority omitted).  Although a court "will not rewrite a . . . law to conform it to constitutional requirements[,]" it must satisfy itself "that no 'limiting construction' or 'partial invalidation' could 'remove the seeming threat or deterrence to constitutionally protected expression.'" Id. (quoting also Virginia v. American Booksellers Ass'n, Inc., 484 U.S. 383, 397 (1988)).

Additionally, this case invokes the special rules relating to speech within the confines of the public school.

25

Accordingly, other cautionary considerations apply as well:

> First . . . "the overbreadth doctrine warrants a more
> hesitant application in [the public school] setting
> than in other contexts. As the court in <u>Sypniewski</u>
> noted,
>
> > <u>Tinker</u> acknowledges what common sense tells
> > us: a much broader "plainly legitimate" area
> > of speech can be regulated at school than
> > outside school. Speech that disrupts
> > education, causes disorder, or
> > inappropriately interferes with other
> > students' rights may be proscribed or
> > regulated. . . . Everyday school discipline
> > does not depend on the necessity of a speech
> > code. In the public school setting, the First
> > Amendment protects the nondisruptive
> > expression of ideas. It does not erect a
> > shield that handicaps the proper functioning
> > of the public schools.

<u>Id.</u> at 258 (quoting <u>Sypniewski</u>, 307 F.3d at 259). Courts have

also recognized that although speech codes are disfavored in view

of the First Amendment, "a public school's speech/disciplinary

policy need not be as detailed as a criminal code." <u>Id.</u> at 259

(citations and footnotes omitted).


D.    Application of <u>Tinker</u> and the Overbreadth Doctrine


         At the outset, the court notes the absence of any

apparent constitutional violation by the board. Indeed, the

board appears to have remained aloof from this controversy since

its inception. Rather, the sum and substance of the verified

                                    26

complaint is that the principal, acting through the school's unconstitutional interpretation of the county policy, hindered plaintiff's free expression. The board is in no way implicated in the principal's actions. Consequently, the court FINDS and CONCLUDES that plaintiff has failed to meet his burden of proof against the board. Accordingly, the court ORDERS that the board be, and it hereby is, dismissed with prejudice from this action.

Regarding the principal, and the school's policy, the court notes at the outset that plaintiff's challenge is extraordinarily narrow. He has no quarrel with either the board policy or, with one exception, the interpretation placed upon it by the school's policy. That single exception is but one phrase of one sentence of the school's policy prohibiting "items displaying the Rebel flag" within the category "racist language and/or symbols or graphics . . . ."  (Pl.'s ex. 2.)

Similar to <u>Newsom</u>, plaintiff appears to anchor his overbreadth argument with his assertions that the flag ban (1) applies to images and messages that are neither racially offensive nor threatening, and (2) was put in place despite the lack of school history that its display substantially disrupted operations or interfered with the rights of others.

The starting point in the analysis is the school's history of any instances where the flag disrupted the learning environment or interfered with the rights of others. A close examination of that comparatively benign history readily distinguishes this case from <u>Scott</u>, <u>Sypniewski</u>, and <u>West</u>. The highly charged racial settings in those cases are wholly distinct from that existing at the school, or indeed in the county generally. This case does not involve flag-based physical violence between students, a pervasive background of demonstrated racial hostility, or the involvement of any hate groups aligned on either side of a serious racial divide.

Just the opposite is true. In the estimation of Ms. Adkins, a friend of plaintiff and one of the school's few African-American students, there exists at the school an environment in which people of both races mix freely together and form good relationships. In her three-plus years at the school Ms. Adkins has not witnessed any disputes of a racial magnitude involving the flag.

The principal was understandably influenced by three negative flag events she experienced over many years of dedicated service at Poca and Buffalo, two of the four high schools in the county. These events, however, are plainly insufficient to

28

warrant a flag ban at the Hurricane school under <u>Tinker</u>.  None of them involved physical violence, and the two incidents at Poca in 1989 and 1994 were separated by five (5) years, the most recent of which occurred over a decade ago, followed eight (8) years later by the incident at Buffalo.  No incident is reported by her from the fourth high school in the county, at Winfield, where she had also taught.

Although the September 2004 incident at Hurricane involving the drawing of a small flag on an inside page of the notebook is disturbing, particularly in view of the highly derogatory wording on the cover as well as that on the two interior pages, it is of little relevance to the analysis. First, it post-dated the ban.  Indeed, one is left to wonder whether the ban itself, fresh in the mind of a potential troublemaker, was seen by the anonymous racist as a means to grab attention by pushing a disciplinary "hot button" of sorts. Second, the incident did not involve clothing worn by a readily identifiable, and hence accountable, student.  Instead, it included a hastily drawn image by an unknown perpetrator.  Third, and perhaps most importantly, the crude notebook drawing of the flag was simply incidental to, and overshadowed by, the heinously offensive messages that accompanied it.

29

One is thus left with little to no evidence that the across-the-board ban was "necessary to maintain order and discipline" at the school. <u>Newsom</u>, 354 F.3d at 259 (stating also "In the absence of past incidents, courts have concluded that school authorities have failed to establish a sufficient likelihood of disruption to support the ban on speech."). In view of this evidentiary vacuum, the flag ban "can be understood as reaching lawful, nonviolent, and nonthreatening symbols . . . ." <u>Id.</u> at 259-60.

Put another way, there are a variety of innocent flag uses that would be silenced by the broadly worded policy. These uses, which would neither be intended, nor reasonably conceived, to amount to the advancement or glorification of racism, would nonetheless be suppressed. This is so because of the sea of interpretations about what the flag represents. On one end of the spectrum, the flag certainly is identified with an infamous entity in our nation's history that sought to defend slavery and abandon the Union. Further along the spectrum, the flag has been used as a badge of racism. Somewhere in the middle of the spectrum we have wearers like the plaintiff who equate the flag with their geographical heritage and as a purely historical observance of their ancestors' service in the Confederate army,

30

without a concomitant celebration of that secessionist cause. Finally, on the opposite end of the spectrum, some wearers merely intend to convey the idea that they consider themselves as "rebels" of sorts, without any reference at all to the substance of the Confederate cause.  Outside of this spectrum, one can even conceive of competing forms of speech designed to denigrate the flag, employing its likeness for the sole purpose of its desecration.

To suggest a ban is warranted simply because some associate it with racism proves too much for First Amendment purposes:

> The Confederate battle flag itself is a catalyst for the discussion of varying viewpoints on history, politics, and societal issues. Discourse on such issues, without the fear of undue government constraint or retaliation, is exactly what the First Amendment was designed to protect. See Mills v. Alabama, 384 U.S. 214, 218-19, 86 S.Ct. 1434, 16 L.Ed.2d 484 (1966); Thornhill v. Alabama, 310 U.S. 88, 102, 60 S.Ct. 736, 84 L.Ed. 1093 (1940). Repressing this kind of discussion would be as unreasonable, and hopefully unthinkable, as a rule that forbids students to discuss the Constitution of the United States on the basis that it recognized slavery or forbids the display of the American flag because it has been carried by hate groups.

Denno v. School Bd. of Volusia Cnty., 218 F.3d 1267 (11th Cir. 2000) (Forrester, J., dissenting).  Depending upon their point of view, display of the flag might make some uncomfortable.

31

"[D]isruption for purposes of <u>Tinker</u>[,]" however, "must be more
than 'the discomfort and unpleasantness that always accompany an
unpopular viewpoint.'  <u>Tinker</u>, 393 U.S. at 509, 89 S.Ct. 733.  As
a general matter, protecting expression that gives rise to ill
will--and nothing more--is at the core of the First Amendment."
<u>Sypniewski</u>, 307 F.3d at 265.

        Another problem with the policy is that it institutes
an outright ban on "<u>items</u> displaying the Rebel flag . . . ."
(Pl.s' ex. 2 at 2 (emphasis added).)  Although the quoted phrase
is found in a document dealing with appropriate dress, the
breadth of its chosen verbiage necessarily leads persons
regulated thereunder to inquire whether they will be punished for
displaying non-clothing "items" upon which the flag appears,
fearing use of prohibited "racist . . . symbols" at the school.
(<u>Id.</u>)  This is troubling for a variety of reasons, not the least
of which being there are a whole host of library and
instructional materials upon which the flag might be expected to
appear.  By example, recent editions of <u>The Recollections &
Letters of Robert E. Lee</u> (1998) and <u>The Red Badge of Courage</u>
(1987) include flag depictions on their covers.[10]

---

        [10]Although the court need not reach the issue, the school's
policy is troubling from another standpoint.  The evidence
indicates the dress code enforcement policy has been implemented
in an uneven and viewpoint-specific manner.  <u>Castorina</u> makes the
                                                    (continued...)

32

message

Additional examples of non-offensive, yet banned, flag

displays are near limitless.  Accordingly, the school's policy is

deemed constitutionally overbroad in employing the following

sentence: "This includes items displaying the Rebel flag, which

has been used as a symbol of racism at high schools in Putnam

County."[11] (Pl.'s ex. 2 at 2.)  This portion of the school's

---

[10] (...continued)
point:

> In the instant case, Dargavell and Castorina claim that
> students in Madison County wore clothing bearing the
> "X" symbol associated with Malcolm X and the Black
> Muslim movement. The school's refusal to bar the
> wearing of this apparel along with the Confederate flag
> gives the appearance of a targeted ban, something that
> the Supreme Court has routinely struck down as a
> violation of the First Amendment.

> . . . .

> If the students' claims regarding the Malcolm
> X-inspired clothing (i.e. that other students wore this
> type of clothing and were not disciplined) and their
> claims that there were no prior disruptive altercations
> as a result of Confederate flags are found credible,
> the court below would be required to strike down the
> students' suspension as a violation of their rights of
> free speech as set forth in Tinker. In addition, even
> if there has been racial violence that necessitates a
> ban on racially divisive symbols, the school does not
> have the authority to enforce a viewpoint-specific ban
> on racially sensitive symbols and not others.

Castorina, 246 F.3d at 541, 544.

[11]The court notes defendants have not offered a limiting
construction.  In view of the unqualified language relating to
the ban, such a construction would be futile.  See Newsom, 354
(continued...)

policy, well intentioned though it be, may not be enforced.  The
principal's actions to the contrary were in derogation of
plaintiff's rights under the First Amendment.


IV. Conclusion


In <u>Tinker</u>, the Supreme Court observed "in our system,
undifferentiated fear or apprehension of disturbance is not
enough to overcome the right to freedom of expression" in our
schools.  <u>Tinker</u>, 393 U.S. at 508.  By clarifying the policy
without any history of the flag "materially disrupt[ing] class
work or involv[ing] substantial disorder or invasion of the
rights of others[,]" <u>id.</u> at 513, the principal acted with only "a
remote apprehension of disturbance" rather than "a specific and
significant fear of disruption . . . ."  <u>Id.</u>  Although the best
of intentions undergird the policy, the offending portion
unjustifiably silenced a significant amount of permissible speech
in contravention of the First Amendment.

------------------------------

[11](...continued)
F.3d at 260 n.8.
    The court also takes note of defendants' argument that the
flag ban is required by federal law in view of the school's
responsibility to halt discrimination on the basis of race.  Were
the flag patently offensive, the argument would take on more
compelling force.  As it is, however, the competing views on the
flag, along with the complete absence of any complaints about its
display in this case, totally eviscerate the contention.

34

Based upon the foregoing, the court FINDS, CONCLUDES, and DECLARES that the identified sentence violates the First Amendment.  The principal and her agents are, accordingly, ENJOINED from enforcing that portion of the policy found to be constitutionally overbroad in violation of the First Amendment. The court further ORDERS the principal to expunge from plaintiff's record any reference to the disciplinary actions that formed the subject matter of this action.

In closing, this opinion should not be interpreted as offering a safe haven for those bent on using the flag in school as a tool for disruption, intimidation, or trampling upon the rights of others.  Should that occur, or be reasonably forecast by the school, the very ban struck down today might be entirely appropriate.  This is so because "[s]tudents cannot hide behind the First Amendment to protect their 'right' to abuse and intimidate other students at school."  <u>Sypniewski</u>, 307 F.3d at 264.

The Clerk is directed to forward copies of this written opinion and order to all counsel of record.

DATED: May 31, 2005

John T. Copenhaver, Jr.
United States District Judge

35